CHICAGO &. N. W. RY. CO. v. SMITH et al.

SMITH v. CHICAGO & N. W. RY. CO. et al.

(District Court, D. South Dakota, S. D. January 20, 1914.)

Nos. 519, 554.

1. CARRIERS (§ 12*) — STATE REGULATION OF RATES — REASONABLENESS OF RATES.

The value of the property of the Chicago & Northwestern Railway Company in South Dakota devoted to the intrastate passenger traffic and the gross earnings, and expenses and charges properly assignable

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Index:s

to such traffic, determined, based on reports of the business for one year, and on the basis of the amount of business done in such year a passenger rate of 2½ cents per mile fixed by order of the State Board of Railroad Commissioners, *held* not confiscatory, but the subsequent act of February 2, 1909 (Acts S. D. 1909, c. 6), fixing such rate at 2 cents per mile, *held* confiscatory and unconstitutional.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

2. CARRIERS (§ 12*) — STATE REGULATION OF RATES — REASONABLENESS OF RATES.

Where it appears from the evidence that the net earnings of a railroad company from intrastate business under a rate fixed by state authority will approximate a sum that would give a fair return on the value of the property devoted to the service, and the evidence consists largely of opinions as to values upon which the witnesses differ considerably, a federal court is not justified in declaring such rate confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

In Equity. Suit by the Chicago & Northwestern Railway Company against Daniel H. Smith, William G. Smith, and George Rice; and supplemental bill by Harold C. Smith against the Chicago & Northwestern Railway Company, F. C. Robinson, W. G. Smith, and George Rice, constituting the Board of Railroad Commissioners of the State of South Dakota, Samuel W. Clark, Attorney General of the said state, and Olaf Eidem, William H. Warren, O. S. Hagen, Harlan J. Bushfield, Royal C. Johnson, Len W. Martin, M. J. Russell, Mark W. Sheafe, Jr., C. A. Mead, William J. Jacobs, William S. Issenhuth, L. T. Van Slyke, J. H. Bottum, D. J. Keefe, E. H. Wilson, E. L. Grua, L. L. Fleeger, A. B. Carlson, Charles Stickney, Peter Olson, Joseph Janousek, P. J. Donohue, S. E. Wilson, A. T. Feay, John P. Milek, John Heffron, John W. Raish, and Chauncey L. Wood, State's Attorneys. On final hearing. Decree for defendants on original bill, and for complainant on supplemental bill.

A. K. Gardner, of Huron, S. D., and C. C. Wright, of Chicago, Ill. (E. M. Hyzer, of Chicago, Ill., of counsel), for complainants and for Chicago & N. W. Ry. Co.

R. C. Johnson, Atty. Gen., and P. W. Dougherty, Asst. Atty. Gen., for defendants.

WILLARD, District Judge. The first of these cases relates to the 2½-cent passenger rate over the lines of the Chicago & Northwestern Railway Company in South Dakota, and the second one to the 2-cent passenger rate over the same lines.

On September 20, 1907, the Board of Railroad Commissioners of South Dakota promulgated an order declaring that the maximum passenger rate over certain lines in the state, including the lines of the Chicago & Northwestern Company, should be 2½ cents per mile between points within the state. This order went into force on October 15, 1907.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

On or about October 3, 1907, separate bills in equity were filed against the board praying for injunctions against the putting into effect of said order of September 20, 1907, as confiscatory and as denying the equal protection of the law, by the Chicago & Northwestern Railway Company, the Chicago, Milwaukee & St. Paul Railway Company, the Pierre & Fort Pierre Bridge Railway Company, the Pierre, Rapid City & Northwestern Railway Company, the Chicago, St. Paul, Minneapolis & Omaha Railroad Company, the Chicago, Rock Island & Pacific Railway Company, the Chicago, Burlington & Quincy Railroad Company, and the Minneapolis & St. Louis Railroad Company.

Restraining orders were entered, and on or about January 13, 1908, temporary injunctions were issued in said causes, prohibiting the board from putting said order of September 20, 1907, into effect.

In the Chicago, Milwaukee & St. Paul Railway case the present special master was appointed as such on October 8, 1908. Arrangements were made in the other causes to suspend further proceedings until the determination of said cause. The taking of testimony in that case began on December 8, 1908, and was four days thereafter, at the request of the Assistant Attorney General, adjourned to enable the officials of said railway company to furnish detailed information as to the original cost of construction of the company's lines in South Dakota. Before the master had been advised that such information had been furnished, the Legislature of South Dakota on February 2, 1909, enacted chapter 6, which was approved February 2, 1909. That act fixed the maximum rate for passengers at 2 cents per mile, and was applicable to the Chicago & Northwestern Railway Company.

On February 3, 1909, a bill in equity was filed in this court by Harold C. Smith against the Chicago & Northwestern Railway Company, the several members of the board, and sundry state's attorneys, seeking to prevent the enforcement, because confiscatory and as denying the equal protection of the law of the said chapter 6.

On August 16, 1909, John H. Gates, Esq., of Sioux Falls, was appointed special master in chancery in said causes with power and direction "to take the testimony therein and from such testimony to find the facts proven by said testimony, and to report said facts to this court." The taking of testimony began on December 29, 1909, was concluded on July 20, 1910, and the master filed his report September 23, 1911, returning therewith the evidence taken before him. Nothing more was done with the case until after the decision of the Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, on June 13, 1913.

The way in which this case now comes before the court and the precise questions at this time to be decided should first be made clear. Exceptions to the master's report were filed by both sides. Equity Rule 66 (33 Sup. Ct. xxxviii) provides:

"The master, as soon as his report is ready, shall return the same into the clerk's office and the day of the return shall be entered by the clerk in the equity docket. The parties shall have twenty days from the time of the filing of the report to file exceptions thereto, and if no exceptions are within that period filed by either party, the report shall stand confirmed. If exceptions are filed, they shall stand for hearing before the court, if then in

session, or, if not, at the next sitting held thereafter, by adjournment or otherwise."

Former rule 83, which was in force when the report was filed, contained the same provision. Proceeding apparently under this rule, counsel for the state on July 17, 1913, moved:

"That a day of hearing be appointed for the argument of the exceptions to the master's report filed in the above-entitled causes, and that the report of the master in all things be confirmed."

On July 18, 1913, the court set the said motion for hearing on August 19, 1913. By agreement made on August 1, 1913, the hearing was continued to September 25, 1913. On September 8, 1913, counsel for the state made a motion to dissolve the temporary injunction, and the same was set down for hearing on September 25th. On September 13, 1913, the same counsel made a motion that the bills be dismissed on the merits, "on the ground and for the reason that the complainants in said original and supplemental bills had wholly failed to prove such a state of facts as would entitle them or either of them to the relief demanded in said bills, and for the further reason that there is an entire failure of proof on the part of the complainants to sustain the allegations contained in the original bills and in the supplemental bill." By order of September 15th this motion was set down for hearing on September 25, 1913. On that day the case came on for hearing, was argued orally, and subsequently briefs were filed by both parties.

It is apparent that the motion to dissolve the temporary injunction is improper at this time, or, in any event, superfluous. The case is now for final hearing. The result of this hearing will be either a dismissal of the bills, in which case the injunction necessarily falls; or the granting of some relief to the plaintiffs, in which case the injunction necessarily stands.

The other motion, namely, to dismiss the bills, may have been made on the theory that after the master's report had been confirmed it was still necessary for the state to move for a decision in its favor. That, however, is a mistaken theory, for after such a final hearing the court will proceed to a decree for one party or the other, and no motion to that effect is necessary. However, part one of the state's brief is, with the exception of Hillman's testimony as to the gross earnings theory, taken up entirely with a discussion of the plaintiffs' evidence. It may be therefore that the motion is made on the theory that the court will now examine the plaintiffs' evidence to see if it made out a case, and if it did not will dismiss the bills without considering whether the testimony of the defendants has aided the plaintiffs. It is apparent that such a motion made on that theory now comes too late. The master decided the case on all of the evidence, and has reported what the facts are. It is upon these facts, and others which may appear from all of the evidence, that the court will decide the case. It will not now stop to inquire whether or not the plaintiffs have made out a prima facie case. The only question therefore before the court is whether or not, upon the master's report and all of the evidence in the case, the decree should be for the plaintiffs or for the defendants.

[1] The master reported the value of the company's property devoted to the passenger traffic, the revenue from the passenger traffic, and the expenses of that traffic. After determining in this way the net income from that source, he reported the returns which the company would receive upon its investment in the passenger business at the different rates of 3 cents, $2\frac{1}{2}$ cents, and 2 cents per mile. All of these findings were based upon the business of the company for the year ending June 30, 1908.

## Value of the Company's Property in South Dakota.

The evidence of the company showed this value as of June 30, 1908, based upon the cost of reproduction of the railroad, to be $28,495,617. It allowed nothing for depreciation, claiming that maintenance offset depreciation.

The evidence of the state showed the valuation at that time, upon the basis of cost of reproduction new, to be $26,311,400. Witness for the state then stated the amount of depreciation, and fixed the value of the property in its then condition at $22,608,115. The master, with slight modifications, accepted the state's valuation, and fixed the value of the property in its then (June 30, 1908) condition at $22,598,602.

Although the master in this case made his report after the master's report and the Circuit Court opinion in the Minnesota Rate Cases had been filed, but before the decision of the Supreme Court therein, he did not fall into one error which that decision pointed out. The company in this case claimed an allowance for adaptation and solidification of roadbed. It added therefore to its estimate of the cost of reproduction of the roadbed on the ground of adaptation and solidification, about 2 cents per cubic yard as the price for doing that work, which would be about 7 per cent. of the total estimate of that cost on the lines west of the river, and about $7\frac{1}{2}$ per cent. on that east of the river. The state's witnesses allowed nothing on account of this item. (Witt, pp. 1994, 2254–2284.) The master accepted the state's claims in that respect, and allowed the company nothing for adaptation and solidification, deducted from the cost of reproduction new, namely, $26,311,400, depreciation, and adopted, as has been said, the sum of $22,598,602. This amount does not include any sum allowed as an element of value because the railroad was a going concern. (Witt, p. 2263.)

The table of valuation contains 29 items. None of these seems to be now objected to by either party, except item No. 1. That item is as follows, in state's Exhibit C:

|  |  |  | Cost of reproduction new. | Present value. |
|---|---|---|---|---|
| Lands for rt. of way | 16,138.6 acres | $32 x $2\frac{1}{2}$ | 1,292,483 |  |
| Lands for yards and station grounds | 3,365.04 | $256 x $2\frac{1}{2}$ | 2,153,357 |  |
| Other real estate | 360.00 |  | 12,300 |  |
|  |  |  | 3,458,140 | 3,458,140 |

To this item the company does not object. It is willing to accept as the value of the right of way, station grounds, etc., the amount fixed by the state's witnesses, namely, $3,458,140. The state, however, does now object, because in reaching that amount its witnesses made use of multipliers, a practice which it says was condemned by the Supreme Court in the Minnesota Rate Cases. This objection was first made at the hearing. The state filed no exception to the finding of the master that the value of the right of way, station grounds, etc., was $3,458,-140. The evidence of both sides showed that at that time it was customary, in making such valuations, to ascertain the market value of contiguous farms by the acre, and multiply that value by 2, or 2½, or 3, in order to ascertain what the cost to the railroad company for the strip of land taken would be. In this case the state used for a multiplier 2½, and the defendant used as a multiplier 3 for farm lands only. This practice had not been condemned by the Supreme Court at the time exceptions were filed. Under these circumstances, I do not think that the lack of an exception should prevent the court from noticing what is claimed by the state to now be a plain error.

In the appraisals of both sides the lands were divided into two classes: (1) Right of way, and (2) stations grounds. The latter class included all of the right of way within the corporate limits of any town, city, or village. Each piece of this property was appraised separately by the state's witnesses at the market value of contiguous property. They attempted to determine what lands in that vicinity were selling for in the market. Having determined this value for each tract in the cities and villages, it was found that the average value per acre for station grounds was $256. This was first multiplied by 3,365.04, the number of acres, and that result was then multiplied by 2½. The reasons for doing this, as given by Witt, were as follows:

"A multiple was placed upon this property, this value of 2½, as there are very few large terminals or large cities in this state. Nearly all the small towns here have corporate limits which extend beyond the built-up portion of the city, and a great deal of the property that is included in this 3,365.04 acres is outside of the business section. The multiple as stated for the business section would approximate probably two times or over, and it was decided by taking 2½ for both or for all the property of the railroad company, both for land outside of the corporate limits and for yards and station grounds, would be the fair and reasonable basis."

The testimony of the company's witnesses showed that in relation to farm lands the use of the multiple 3 gave the actual cost to the company. There was, however, no evidence that in the case of town lots their experience would justify such action. An examination of the evidence satisfies me that the use of any multiple, so far as station grounds (that is to say, lands within corporate limits) are concerned, was improper. The master himself, as appears from his report, was not satisfied with its use.

This ruling does not, however, require the rejection of the entire valuation, as was done in the Minnesota Rate Cases. There the witness Cooper did not state in his testimony the market value of contiguous lands. It appears that, after determining it, he, without stat-

ing what it was, added an arbitrary sum, and the result thus obtained he called the market value. This latter sum he multiplied by 3. Nowhere in that case did the market value of contiguous lands appear. That does appear in this case, both in the evidence of the state, and in that of the company. The market value, according to the state's witnesses, was $849,581, and according to the company's witnesses $860,751, a difference, as is seen, of only about $10,000. I accept the state's figures and place the valuation of the station grounds at $849,581. This sum was not arrived at by estimating "what would be the actual cost of acquiring the right of way if the railroad were not there." It was the market value, at the time of the appraisal, of property contiguous to the railroad, on the theory that the railroad was there. It contains no sum allowed for "railway value." It is not "in excess of the market value of contiguous and similarly situated property." The other lands making up the right of way, namely, lands outside of the incorporated towns, cities, and villages, and which may be called farm lands, amounted to 16,126.3 acres (Exhibit 45). Each tract of land included in this acreage was valued separately by the state's witnesses. The total valuation was then divided by the number of acres, and the result gave $32 as the average market value of an acre. What was said above in regard to the valuation of station grounds is true of the valuation of the farm lands. Nothing was added for "railway value." Nothing was added as an excess of cost which the company would have to pay over what an individual would have to pay. The $32 an acre represents the market value of contiguous lands. The total valuation thus obtained by the state's witnesses was $516,079.05; by the company's witnesses $756,950.58.

But after obtaining these results the state's witnesses multiplied their amount by 2½ and the company's witnesses multiplied their amount by 3. The result thus obtained by the state before the acreage was revised was $1,292,483 as the value of the right of way outside of cities and villages. The company now contends that this sum should be accepted as such value. The defendant's claim is that the evidence in this case is essentially different from the evidence in the Minnesota Rate Cases; that there is here proof of the actual market value of contiguous lands, which did not appear in that case. Witt, the state's witness, testified with regard to multipliers as follows:

"You may state why you apply any multiple at all, instead of using just simply the straight acreage value, Mr. Witt. A. It is a well-known fact and I personally know of instances where a railway company has had to pay a sum in excess of the value of the property for ordinary farm purposes, on account of the damage that is done to adjacent property, and for various reasons, such as the desire to get a certain location, and it is my belief that the multiple should be used above the value as farm property. * * * I determined the multiple to be used, if any should be used, by investigating what had been determined by the railroad commissions in making similar valuations of railroad property, and also secured the records of transfers that had been made of property in this state to railroad within the last few years that have built new lines in this state, and, by a comparison of this value with the value as determined from the transfers of adjacent property on file in the offices of the registers of deeds of the different counties; we decided by adopting the ratio of 2.5 we would come, approximately, as close as pos-

sible to the average multiple value or value which the railroad would probably be required to pay for such property. The average value of the state worked out $32 an acre approximately. Taking the acreage of 16,138.6, multiplying that by 32, and by the multiple 2½, gives a value of $1,292,483."

Vallette, a witness for the company, and who had been connected with the company for many years as right of way agent, testified:

"Q. What has been your observation as the parity between the land value and the right of way value, and I mean by that the acreage value of the land and the value of the right of way, which, of course, includes damages done to the property traversed by the right of way? A. My observation is that it comes pretty close to three to one, so much so that the Northwestern Railroad has adopted that as a rule in valuing lands as a general proposition. * * * We have found by experience that when we sum up at the end of our buying a piece of right of way through the country our rule of three to one holds pretty close."

Other right of way agents of the railroad company testified to the same effect. (Cleveland, pp. 734–737; Treadway, pp. 745, 746.)

From this evidence the company argues that it is unfair to say that for a strip of land 100 feet wide through the middle of a 160-acre farm it should be allowed no more as the cost of reproducing it than the price per acre if the whole farm were to be bought; that it is a matter of common knowledge that, if a private individual wanted to buy such a strip, it would cost him much more per acre than the value per acre of the whole farm.

It is true that the evidence in this case does differ from that in the Minnesota Rate Cases, and there is much force in the company's argument. But the defendant's claim in this respect is disposed of by what the Supreme Court, in the Minnesota Rate Cases, 230 U. S. on page 455, 33 Sup. Ct. on page 763, 57 L. Ed. 1511, said:

"The company would certainly have no ground of complaint if it were allowed a value for these lands equal to the fair average market value of similar land in the vicinity, without additions by the use of multipliers, or otherwise, to cover hypothetical outlays. The allowances made below for a conjectural cost of acquisition and consequential damages must be disapproved; and, in this view, we also think it was error to add to the amount taken as the present value of the lands the further sums, calculated on that value, which were embraced in the items of 'engineering, superintendence, legal expenses,' 'contingencies,' and 'interest during construction.'"

I, accordingly, adopt the valuation placed upon these lands by the state before any multiplier is used, namely, $516,079.

Item 1 as thus revised gives therefore these results:

| | |
|---|---:|
| Station grounds | $ 849,581 |
| Right of way outside station grounds | 516,079 |
| Gravel pit | 12,300 |
| | $1,377,960 |

The master accepted as the cost of reproduction of right of way in its present condition the sum of $3,449,826. This has now by the elimination of the use of multipliers been reduced to $1,377,960. There was therefore the sum of $2,071,866 included by the master in his total valuation which should not have been included. Upon this sum

of $2,071,866 the percentages in items 23A and 29 amounting to 14 per cent. were allowed. This allowance, to wit, $290,061, also should be deducted from the total cost of reproduction of the railroad property as found by the master. The sum so found by him was $22,598,602. Deducting the sums of $2,071,866 and $290,061, there is left the sum of $20,236,675, which sum I adopt as the cost of reproduction of the railroad in its present condition.

The master having fixed the cost of reproduction, present condition, at $22,598,602, for reasons stated in his report, reduced this valuation to $20,000,000. After carefully considering such reasons, I cannot agree with the master in this reduction. I sustain the company's exception to this finding, and I determine that the value of the company's property in South Dakota was on June 30, 1908, $20,236,675.

### Gross Earnings.

The company's proof (Exhibit 55, sheet 1) showed that its total gross operating revenue in South Dakota for the year 1908 was $3,-060,845.93. The master found that of this sum $1,605,731.59 was earned in the passenger service, and $1,455,114.34 in the freight service. To this sum of $3,060,845.93 claimed by the company to be its total revenue, the master added $5,552.96 as income from rentals and joint facilities and $130,890.54 derived from outside income.

The state has filed no exceptions to the master's finding as to earnings. The company does not now make any objection to the item of $5,552.96, but it does object to the addition of the $130,890.54. The state in its brief suggests that the company's exception to this conclusion was abandoned when exception No. 25 was withdrawn. Exception 24, however, which raises the point more fully, has not been withdrawn.

The property from which this so-called outside income was derived is described in Exhibit K and in the testimony of Brandriff, a witness for the company. In Exhibit K the following appears:

| | |
|---|---:|
| Dividends on stock owned | $1,903,510 00 |
| Interest on bonds | 3,150 00 |
| Interest on loans and balances | 881,962 78 |
| Miscellaneous | 388 25 |
| These items make a total of | $2,789,011 03 |

It appears from the testimony of Brandriff and the statements made in the annual reports to the South Dakota commissioners that among the stocks owned by the company were some of the Chicago, St. Paul, Minneapolis & Omaha Railway Company, and some of the Union Pacific Railroad Company. The item of interest on balances means the interest paid by banks on the cash balances of the company therein. The item interest on loans Brandriff illustrated by a concrete case as follows:

"The Wyoming & Northwestern Railway, for instance, is owned entirely by the Chicago & Northwestern Company and is considered one of its proprietary companies. The money was advanced by the Chicago & Northwestern.

for the building of that road, and there was charged up against that road interest for the amount advanced for the construction of its property."

It appeared that no part of the total of $2,789,011.03, except possibly $7,318, was derived from any property of the company in South Dakota, and that it was not, with the exception of $7,318, in any way connected with the operation of the lines in that state.

The master made certain deductions from this total, and found the revenue from these sources for the year 1908 to be $2,183,364.78. Dividing this upon the expenses basis, he assigned to South Dakota as its share $130,890.04. In assigning a part of these earnings to South Dakota, the master I think erred. If to South Dakota had been assigned its share of the property from which this income was received, and the valuation of the company's property therein had been thereby increased, there could be no objection to this assignment. But I am unable to find that the outside property appears anywhere in the valuation. It is said, however, that the expense of maintaining the general offices has been in part assigned to South Dakota, and that this income should therefore be so assigned. This argument cannot prevail, for the amount of money paid out by the company for looking after these investments must necessarily have been so trifling as to be completely negligible.

The state's exceptions based upon the fact that after the test year of 1908 the business of the company had increased, and would increase even if the lower rates were put in force, are overruled on the authority of Chicago & Northwestern Railway Co. v. Dey (C. C.) 35 Fed. 866, 1 L. R. A. 744.

The gross revenue for the state for 1908, to wit, $3,197,289.43 should be reduced by the amount of $130,890.54. This would leave as such revenue $3,066,398.89.

### Expenses.

The master found that the operating expenses for the year 1908 properly chargeable to the lines in South Dakota amounted to $2,496,-428.53. This is not now criticised by the company. Nor does the state make any complaint thereto, either by exception or in its brief. To this sum of $2,496,428.53 should be added taxes for the year amounting to $174,602.51. The total expense was therefore $2,671,031.04. A summary of valuation, earnings, and expenses would therefore be as follows: Valuation of property, $20,236,675. Gross earnings, $3,-066,398.89; gross expenses, $2,671,031.04. The net income would be $395,367.85. Dividing this income by the valuation, we have a percentage of .0195 as the rate of return from the operation of the entire system in South Dakota for the year 1908.

Upon this showing the company claims that the case falls within the rule of the Minneapolis & St. Louis R. Case, reported with the Minnesota Rate Cases in 230 U. S. at page 469, 33 Sup. Ct. 729, 57 L. Ed. 1511. It there appeared that the net return on all of the company's business in Minnesota, interstate and intrastate, was in 1907

210 F.—41

about 4.14 per cent. on the estimated value of its property in Minnesota; in 1908 it was less than 3.5 per cent.; and in 1909 less than 3.7 per cent. Without pausing, to separate the interstate from the intrastate business, the Supreme Court held that the rates there in question were confiscatory. The same thing was done in two of the Missouri cases. Missouri Rate Cases, 230 U. S. at 507, 33 Sup. Ct. 975, 57 L. Ed. 1571.

In the case at bar the company claims that its freight rates were established by the railroad commission of South Dakota, and, its passenger rates being so established, it claims that the following quotation from the Minnesota Rate Cases is here applicable:

"For the purpose of determining whether the rates permit a fair return, the results of the entire intrastate business must be taken into account."

If this case had been commenced and tried on the theory now advanced, as was done in the case of Allen v. St. Louis, Iron Mt. & S. Ry., 230 U. S. 553, 33 Sup. Ct. 1030, 57 L. Ed. 1625, the argument of the company would have force. That, however, was not done. Neither one of the bills asks any relief except against passenger rates. While each bill alleges that the company makes no money in South Dakota, neither one alleges that the freight rates were fixed by the state, or that they were unreasonable or confiscatory. The case was tried before the master upon the theory that only the passenger rates were involved. His report is limited to that issue. In fact, it was not until the hearing upon the exceptions to the report that the company presented any evidence showing that the commission had fixed the freight rates, and it was then that it for the first time advanced its present claim. It cannot now ask to have the case decided upon an issue not raised by the pleadings nor tried before the master.

It becomes necessary therefore to examine the master's division of value, earnings, and expenses, first between the freight and passenger service, and then between the interstate and intrastate business.

It is to be observed that the master in this case did not fall into the error, pointed out in the Minnesota Rate Cases, of making any one of these divisions on the gross earnings basis. This method was pressed upon him by the company, but he refused to adopt it, saying:

"It seems to the master that these results conclusively prohibit the use of gross earnings as a factor in cases of this kind. The $10,000,000 example shown by Mr. Justice Brewer in the Tompkins Case, 176 U. S. 167 [20 Sup. Ct. 336, 44 L. Ed. 417] clearly indicated the same absurd results, and the the master therefore feels justified in following Mr. Justice Brewer in the Tompkins Case and in declining to follow the Love Case and the Minnesota Rate Case and the other cases on this subject. In regard to the remark of Judge Sanborn in the Minnesota Rate Case heretofore quoted, 'cases may indeed be imagined in which this basis does not produce persuasive results,' the master is of the opinion that no case can be imagined where such absurd results would not appear unless the freight earnings and passenger earnings were reduced or raised in exactly the same proportion."

Apportionment of Expenses Between Freight and Passenger Services.

Table 3, which shows these expenses, is hereto attached:

TABLE 3.

Chicago & Northwestern Railway Co., Lines in South Dakota.

| I. Maintenance of Way and Structures. | Apportioned to Lines in South Dakota. | Apportioned to Passenger Traffic. | If Apportioned to Passenger Traffic on the Basis of the Preceding Column (Except that Gross Earnings is Here Used to Measure Depreciation in M. W. & S. and S. Accounts). | If Apportioned to Passenger Traffic on Gross Earnings (Complainant's Exhibit 52). | If Apportioned to Passenger Traffic on Revenue Train Miles (Complainant's Exhibit 29). | If Apportioned to Passenger Traffic on Basis of Defendants' Exhibit I. |
|---|---|---|---|---|---|---|
| 1. Superintendence | $35,871.20 | $13,329.74 | $16,577.88 | $17,053.17 | $18,369.64 | $13,889.33 |
| 2. Ballast | 3,480.71 | 1,229.25 | 1,639.62 | 1,654.73 | 1,782.47 | 1,614.82 |
| 3. Ties | 95,043.54 | 35,508.27 | 43,808.73 | 45,183.70 | 48,671.80 | 42,600.75 |
| 4. Rails | 88,820.25 | 38,370.35 | 38,370.35 | 42,225.15 | 45,484.85 | 29,691.33 |
| 5. Other track material | 57,164.18 | 24,694.93 | 24,694.93 | 27,175.85 | 29,273.78 | 19,116.34 |
| 6. Roadway and track | 323,470.47 | 114,236.83 | 152,378.83 | 153,777.86 | 165,649.23 | 128,979.35 |
| 7. Removal of snow, sand and ice | 33,615.58 | 1,851.54 | 1,851.54 | 1,718.85 | 1,851.54 | 1,703.15 |
| 8. Tunnels | 606.71 | 310.69 | 310.69 | 288.43 | 310.69 | 279.92 |
| 9. Bridges, trestles and culverts | 78,151.64 | 27,300.03 | 36,814.11 | 37,183.29 | 40,021.45 | 35,941.61 |
| 10. Over and under grade crossings | 56.56 | 19.48 | 26.89 | 26.89 | 28.96 | 24.60 |
| 11. Grade crossing, fences, cattle guards and signs | 10,003.96 | 3,445.36 | 4,755.88 | 4,755.88 | 5,123.03 | 4,364.10 |
| 12. Snow and sand fences and snow sheds | 4,295.50 | 1,479.37 | 2,042.08 | 2,042.08 | 2,199.73 | 2,199.73 |
| 13. Signals and interlocking plants | 254.35 | 87.60 | 120.92 | 120.92 | 130.25 | 119.52 |
| 14. Telegraph and telephone lines | 8,156.90 | 2,809.24 | 3,877.79 | 3,877.79 | 4,177.15 | 3,877.79 |
| 15. Buildings, fixtures and grounds | 60,543.07 | 20,851.03 | 28,782.18 | 28,782.18 | 31,004.11 | 28,782.18 |
| 16. Roadway tools and supplies | 3,470.58 | 1,289.67 | 1,604.93 | 1,649.91 | 1,777.23 | 1,343.81 |
| 17. Work equipment, repairs | 6,124.74 | 2,275.95 | 2,830.55 | 2,911.70 | 3,136.48 | 2,371.50 |
| 18. Work equipment, depreciation | 1,581.88 | 587.82 | 781.06 | 752.02 | 810.07 | 612.50 |
| 19. Injuries to persons | 1,932.61 | 714.78 | 888.95 | 914.44 | 985.03 | 744.73 |
| 20. Stationery and printing | 1,043.29 | 387.69 | 482.16 | 495.98 | 534.27 | 408.96 |
| 21. Other expenses | 296.54 | 110.19 | 137.05 | 140.98 | 151.86 | 114.82 |
| 22. Maintaining joint tracks, yards and other facilities, Dr. | 2,886.58 | 1,247.00 | 1,247.00 | 1,372.28 | 1,478.22 | 605.25 |
| 23. Maintaining joint tracks, yards and other facilities, Cr. | 319.75* | 138.13* | 138.13* | 152.01* | 163.74* | 67.04* |
| Total maintenance of way and structures | $786,541.97 | $292,298.68 | $363,831.15 | $373,922.07 | $402,788.15 | $318,414.10 |

## II. Maintenance of Equipment.

| | If Apportioned to Passenger Traffic on Basis of Defendants' Exhibit I. | If Apportioned to Passenger Traffic on Revenue Train Miles (Complainant's Exhibit 29). | If Apportioned to Passenger Traffic on Gross Earnings (Complainant's Exhibit 52). | If Apportioned to Passenger Traffic on the Basis of the Preceding Column (Except that Gross Earnings is Here Used to Measure Depreciation in M. W. & S. and S. Accounts). | Apportioned to Passenger Traffic. | Apportioned to Lines in South Dakota. |
|---|---|---|---|---|---|---|
| 25. Superintendence | $4,764.64 | $5,044.76 | $6,371.62 | $5,080.01 | $5,001.87 | $13,402.65 |
| 26. Steam locomotives, repairs | 66,867.50 | 66,867.50 | 73,585.21 | 66,867.50 | 66,867.50 | 154,785.87 |
| 27. Steam locomotives, depreciation | 8,339.71 | 8,339.71 | 9,177.54 | 8,339.71 | 8,339.71. | 19,304.89 |
| 28. Passenger train cars, repairs | 31,145.37 | 31,145.37 | 31,145.37 | 31,145.37 | 31,145.37 | 31,145.37 |
| 29. Passenger train cars, depreciation | 5,474.79 | 5,474.79 | 5,474.79 | 5,474.79 | 5,474.79 | 5,474.79 |
| 30. Freight train cars, repairs and renewals | | | | | | 76,639.03 |
| 31. Freight train cars, depreciation | 3,719.54 | 3,988.22 | 4,974.04 | 3,926.71 | 3,904.74 | 27,639.03 |
| 32. Shop machinery and tools | 719.26 | 761.54 | 961.84 | 759.32 | 755.07 | 10,462.85 |
| 33. Injuries to persons | 323.57 | 342.59 | 432.70 | 341.50 | 339.68 | 2,023.23 |
| 34. Stationery and printing | 64.15 | 67.93 | 85.79 | 67.35 | 67.35 | 910.18 |
| 35. Other expenses | | | | | | 180.46 |
| Total maintenance of equipment | $121,418.53 | $121,982.41 | $132,208.90 | $121,952.73 | $121,896.08 | $342,215.27 |

## III. Traffic Expenses.

| | | | | | | |
|---|---|---|---|---|---|---|
| 38. Superintendence | $6,542.94 | $6,925.75 | $6,776.13 | $6,542.94 | $6,542.94 | $15,645.15 |
| 39. Outside agencies | 11,666.78 | 10,974.57 | 9,532.58 | 11,666.78 | 11,666.78 | 20,221.00 |
| 40. Advertising | 14,881.44 | 14,881.44 | 14,879.36 | 14,881.44 | 14,881.44 | 14,901.01 |
| 41. Traffic associations | 423.71 | 422.49 | 422.49 | 422.49 | 422.49 | 1,158.26 |
| 42. Industrial and immigration bureaus | | | | | | 171.07 |
| 43. Stationery and printing | 2,001.51 | 2,273.58 | 2,232.11 | 2,001.51 | 2,001.51 | 7,373.93 |
| Total traffic expenses | $35,516.88 | $35,477.35 | $33,842.67 | $35,515.16 | $35,515.16 | $59,498.42 |

## IV. Transportation Expenses.

| | | | | | | |
|---|---|---|---|---|---|---|
| 44. Superintendence | $7,535.29 | $12,015.26 | $11,154.18 | $7,740.35 | $7,740.35 | $23,462.72 |
| 45. Dispatching trains | 8,034.31 | 8,034.31 | 7,458.53 | 8,034.31 | 8,034.31 | 15,688.95 |
| 46. Station employés | 30,356.84 | 74,209.64 | 69,690.31 | 28,207.45 | 28,207.45 | 161,551.28 |
| 47. Weighing and car service associations | | | | | | 1,521.75 |
| 48. Stockyards and grain elevators | | | | | | 60.00* |
| 49. Station supplies and expenses | 5,051.70 | 7,740.31 | 7,180.06 | 4,972.35 | 4,972.35 | 15,115.81 |
| 50. Yard masters and their clerks | 30.78 | 30.78 | 30.78 | 30.78 | 30.78 | 2,280.00 |
| 51. Yard conductors and brakemen | 228.98 | 228.98 | 228.98 | 228.98 | 228.98 | 16,961.31 |
| 52. Yard switch and signal tenders | 25 | 25 | 25 | 25 | 25 | 18.94 |

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| 53. Yard supplies and expenses | 47.80* | 65* | 65* | 65* | 65* | 65* |
| 54. Yard enginemen | 12,909.22 | 174.27 | 174.27 | 174.27 | 174.27 | 174.27 |
| 55. Enginehouse expenses, yard | 5,079.55 | 68.57 | 68.57 | 68.57 | 68.57 | 68.57 |
| 56. Fuel for yard locomotives | 18,057.44 | 243.78 | 243.78 | 243.78 | 243.78 | 243.78 |
| 57. Water for yard locomotives | 671.17 | 9.06 | 9.06 | 9.06 | 9.05 | 9.06 |
| 58. Lubricants for yard locomotives | 182.60 | 2.47 | 2.47 | 2.47 | 2.47 | 2.47 |
| 59. Other supplies for yard locomotives | 174.98 | 2.36 | 2.36 | 2.36 | 2.36 | 2.36 |
| 60. Operating joint yards and terminals, Dr. | 955.34 | 12.90 | 12.90 | 12.90 | 12.90 | 12.90 |
| 61. Operating joint yards and terminals, Cr. | 3,755.66* | 50.70* | 50.70* | 50.70* | 50.70* | 50.70* |
| 62. Road enginemen | 191,088.94 | 76,369.26 | 76,369.26 | 76,369.26 | 76,369.26 | 76,369.26 |
| 63. Enginehouse expenses, road | 61,986.76 | 28,140.76 | 28,140.76 | 29,464.24 | 31,728.06 | 28,140.76 |
| 64. Fuel for road locomotives | 297,713.48 | 96,712.84 | 96,712.84 | 96,712.84 | 96,712.84 | 85,057.31 |
| 65. Water for road locomotives | 16,599.47 | 5,372.04 | 5,372.04 | 7,362.86 | 7,512.23 | 5,383.60 |
| 66. Lubricants for road locomotives | 5,665.24 | 2,568.61 | 2,568.61 | 2,683.50 | 2,568.61 | 2,649.17 |
| 67. Other supplies for road locomotives | 6,182.02 | 2,794.25 | 2,794.25 | 2,924.67 | 2,794.25 | 2,881.89 |
| 68. Road trainmen | 187,038.08 | 71,605.42 | 71,605.42 | 71,605.42 | 71,605.42 | 71,605.42 |
| 69. Train supplies and expenses | 46,627.08 | 25,231.77 | 25,231.77 | 21,691.11 | 23,365.63 | 25,097.90 |
| 70. Interlockers, block and other signals, operation | 17.22 | 8.22 | 8.22 | 8.19 | 8.82 | 8.82 |
| 71. Crossing flagmen and gatemen | 1,866.03 | 876.85 | 876.85 | 887.11 | 955.59 | 876.85 |
| 72. Clearing wrecks | 4,235.02 | 1,990.04 | 1,990.04 | 2,013.33 | 2,168.75 | 423.50 |
| 74. Stationery and printing | 10,952.59 | 3,613.26 | 3,613.26 | 5,206.86 | 5,608.82 | 3,517.53 |
| 75. Insurance | 203.72 | 67.21 | 67.21 | 96.85 | 104.33 | 65.43 |
| 76. Other expenses | 609.33 | 201.02 | 201.02 | 299.68 | 312.04 | 196.69 |
| 77. Loss and damage, freight | 48,025.65 | 325.72 | 325.72 | 325.72 | 325.72 | 325.72 |
| 78. Loss and damage, baggage | 325.72 | 156.38 | 156.38 | 226.00 | 273.44 | 158.41 |
| 79. Telegraph and telephone operation | 475.38 | 25,135.40 | 25,135.40 | 23,334.06 | 25,135.40 | 25,135.40 |
| 80. Damage to property | 49,083.00 | 2,407.74 | 2,407.74 | 2,235.18 | 2,497.74 | 2,407.74 |
| 81. Damage to stock on right of way | 4,701.69 | 12,080.44 | 12,080.44 | 12,221.84 | 13,165.34 | 12,080.44 |
| 82. Injuries to persons | 25,708.54 |  |  |  |  |  |
| 83. Operating joint tracks, Cr. | 134.76* |  |  |  |  |  |
| Total transportation expenses | $1,228,607.80 | $405,334.36 | $405,334.36 | $452,364.87 | $465,844.88 | $394,581.05 |

### V. General Expenses.

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| 84. Salaries and expenses of general officers | $11,078.88 | See total | See total | See total | See total | See total |
| 85. Salaries and expenses of clerks and attendants | 29,129.32 | See total | See total | See total | See total | See total |
| 86. General office supplies and expenses | 5,496.10 | See total | See total | See total | See total | See total |
| 87. Law expenses | 13,308.87 | See total | See total | See total | See total | See total |
| 88. Insurance | 13.71 | See total | See total | See total | See total | See total |
| 89. Pensions | 7,429.14 | See total | See total | See total | See total | See total |
| 90. Stationery and printing | 2,792.49 | See total | See total | See total | See total | See total |
| 91. Other expenses | 10,316.56 | See total | See total | See total | See total | See total |
| Total general expenses | 79,565.07 | 28,142.17 | 30,481.38 | 37,825.23 | 40,745.27 | 28,635.47 |
| Total operating expenses | $2,496,428.53 | $883,186.45 | $967,114.78 | $1,030,163.74 | $1,066,837.56 | $898,565.53 |

(Note: The figures to which a star is affixed indicate a credit.)

The master in his report says:

"In the Western Advanced Rate Case testimony was offered (page 357) showing that it was entirely feasible to localize about 51 per cent. of the cost of operation between the freight and passenger service; that about 29 per cent. was subject to some arbitrary division, but that for all practical purposes it would be accurate; and that only 20 per cent. remained to be determined upon an arbitrary basis, and that when this was done the results would not vary 5 per cent. from actual cost."

The company in its brief says:

"It appears that a large part of the expense could be definitely allocated. * '* * The maintenance of equipment expenses can be largely allocated; at least, the principal items could be directly allocated. The traffic expenses could likewise be fairly apportioned, and most of the operating expenses could be allocated. The heaviest item in the transportation expense was that of fuel, which could be practically allocated, and the enginemen's and trainmen's expenses could be allocated."

After localizing the expenses as far as possible, the master used different methods in apportioning different items. For example, on the basis of revenue train mileage, he apportioned No. 7, removal of sand, snow, and ice; No. 45, dispatching trains; No. 70, interlockers, block and other signals; No. 80, damage to property; No. 81, damage to stock on right of way. On the basis of revenue train mileage switching included, he apportioned No. 71, crossing flagmen and gatemen; No. 72, clearing wrecks; and No. 82, injuries to persons. The large item No. 64, fuel for road locomotives, was apportioned by the master to the amount of $96,712.84 on road locomotive mileage basis as claimed by the company. The same thing was done with No. 66, lubricants for road locomotives. On the basis of revenue locomotive mileage, switching included, he apportioned No. 26, steam locomotives, repairs; and No. 27, steam locomotives, depreciation. Subdivision V of table 3, general expenses, was apportioned on the relation which the sum total of the preceding assignments of subdivisions I, II, III, and IV, to the passenger service bore to the sum of said subdivisions assigned to the state.

Of the items in subdivision I, of table 3, maintenance of way and structures, the master said that the greatest difficulty arose because none of them could be localized. The expenses incurred under this subdivision he considered as partly due to wear, and partly to weather stress or depreciation. So far as wear was concerned, he considered that for items 2 to 15, inclusive, 23 and 24, train weights, would be the better basis; but he rejected that because the evidence did not sufficiently show what the train weights for 1908 were. For these 16 items, with respect to wear, he adopted as a basis locomotive mileage switching included. With respect to that part of the maintenance of way and structures accounts caused by depreciation or weather stress, he apportioned it upon the proportion which the passenger percentage of the direct costs accounts (which he determined to be all of subdivision II, No. 40, in subdivision III, and all of subdivision IV, except Nos. 44, 74, 75, 76, and 79) bore to the entire amount of direct costs assigned to the state.

The state filed three exceptions to the methods adopted by the master in apportioning the expenses between passenger and freight. If the

state's exception No. 9 were upheld, it would make a difference of $148.39, and as to the tenth exception a difference of $225.24. The exact claim made in the eleventh exception does not appear. But it appears that if all of them were allowed the result would not be affected. Moreover, the state does not now in its brief insist upon them. They are, accordingly, overruled.

The only objection which the company now makes to the master's apportionment of expenses between freight and passenger relates to the first subdivision, maintenance of way and structures. It contends that as to these items the revenue train mileage most nearly represents the element of use. It criticises the method adopted by the master, saying:

"The master, after thus finding these expenses of maintenance of equipment and transportation expenses, in general divided the maintenance of way and structure accounts between passenger and freight upon the per cent. which the expenses in the maintenance of equipment and transportation accounts of the two classes bore to each other. What possible connection there can be between such expenses and the transportation expenses, for example, it is difficult to conceive. It cannot be believed that the comparative amount of fuel used in a freight train as compared to a passenger train would be any indication of the comparative amount of wear and tear upon the roadway and tracks made by the freight train and the passenger train. It certainly is not a method which represents the use by the two classes of traffic."

To this it may be answered, adopting the language of the brief: It cannot be believed that the comparative number of freight trains run over the tracks, as compared with the number of passenger trains so run, would be any indication of the comparative amount of the wear and tear upon over grade crossings, for example, or on snow and sand fences and snow sheds, or on buildings, fixtures, and grounds. It is to be observed, also, that this expense is due not only to the wear caused by the movement of trains, but also to weather stress, which in many items is much the larger element. Moreover, as was said by the Supreme Court in the Arkansas cases (Allen v. Railway Company, 230 U. S. at page 560, 33 Sup. Ct. at page 1033, 57 L. Ed. 1625):

"It was not sufficient for the complainants to criticise the tests relied upon by the defendants; but, in seeking to override the action of the state upon constitutional grounds, it was incumbent upon them to establish the invalidating facts by definite and convincing proof."

The claims and exceptions of the company to the apportionment of expenses between freight and passenger service are overruled, and the sum of $883,186.45 is adopted as the amount of expenses attributable to passenger traffic. This does not include the taxes. $61,774.37 were assigned to the passenger traffic on this account, to which no objection is now made. The total expense assignable to the passenger traffic is therefore $944,960.82.

The master divided the expense between interstate and intrastate passenger service on the passenger mile basis, and made no allowance for extra cost of doing the local business. For reasons given in the Minnesota Rate Cases, the Missouri Rate Cases, and the case of Allen v. St. Louis Railway Company, the objections of the company to this method are overruled, and the sum of $504,652.74 is adopted as the expense for that service. To this is to be added $35,297.88 on account

of taxes assigned to intrastate passenger traffic, making a total of expenses for that traffic of $539,950.62.

### Division of Earnings.

The earnings of the passenger traffic are found to be $1,461,669.22. Of this amount the master assigned to intrastate passenger traffic $869,-416.14. No objection is made in the briefs to this assignment, and it is adopted as the total earnings of the intrastate passenger traffic. The total earnings of the intrastate passenger traffic being then $869,416.14, and the total expense of the intrastate passenger traffic being $539,-950.62, the net income for that traffic for the year 1908 was $329,-465.52.

### Assignment of Value to Passenger Traffic and to Intrastate Passenger Traffic.

This was assigned to the passenger traffic on the expense basis, the master refusing to follow the prior rulings in this circuit which adopted the gross earnings basis. No objection is now made in the briefs to this expense method. The master found the proportion of passenger expense to total expense to be 35.38. Upon his total valuation of $20,000,000 he determined the value of the property used in the passenger service to be $7,076,000. But the total valuation has been raised to $20,236,675, and upon the percentage of 35.38 the value of the property assignable to the passenger traffic is $7,159,735.61, which is hereby determined to be the value of the property of the company used in the passenger traffic. The master then apportioned his valuation between the intrastate and the interstate passenger business on the expense basis; that is, the proportion which the intrastate expense bore to the whole passenger expense. This he determined to be 57.14 per cent. 57.14 per cent. of the value assigned to passenger traffic gives $4,091,092 as the value assigned to intrastate passenger traffic.

The value of the property used in intrastate passenger business being $4,091,092, and the net income from intrastate passenger traffic being $329,465.52, it results that the return to the company upon this investment was .0805.

Table 4 made by the master to show the return to the company at the rate of 2½ cents and at the rate of 2 cents, which table is attached hereto,[1] contains the same figures as that showing the return at 3 cents, except that the operating revenue item is changed, with the necessary change in the net income. With the changes in his 2½-cent table made necessary by the elimination of the outside income, the net profit at the rate of 2½ cents will be $236,689.44. This upon a valuation of $4,091,092 would give a return of .05785. At the 2-cent rate, making the same deduction from the net income, we have a net profit of $133,-015.84. This upon the valuation of $4,091,092 would produce a return of .0325.

In the Minnesota Rate Cases the rate attacked produced in the case of the Minneapolis & St. Louis Railroad Company in 1907, 4.14 per cent. on the estimated value of the property, in 1908 less than 3.5 per cent., and in 1909 less than 3.7 per cent. As in this case the rate of

---

[1] See table at end of case.

2 cents would produce 3¼ per cent. it is, on the authority of that case, held as to this company to be confiscatory. The result is that the act of the Legislature of 1909 fixing the rate of 2 cents per mile is as to the Chicago & Northwestern Railway Company void, and a decree should be entered for the relief demanded in the supplemental bill of Smith.

[2] As to the rate of 2½ cents attacked by the original bill, it appears that the return would be 5.785 per cent., not far from 6 per cent. But even if a fair return should be fixed at 7 per cent., is the evidence sufficiently definite so that the court can say with certainty that the return, if the rate were put in force, would not be more than 5.785 per cent.?

In the case of Willcox v. Consolidated Gas Co., 212 U. S. 19, at page 42, 29 Sup. Ct. 192, at page 196 (53 L. Ed. 382, 15 Ann. Cas. 1034), the court said:

> "Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory nature, and in that event there should be no hesitation in so deciding and in enjoining its enforcement without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate. But where the rate complained of shows in any event a very narrow line of division between possible confiscation and proper regulation, as based upon the value of the property found by the court below, and the division depends upon opinions as to value, which differ considerably among the witnesses, and also upon the results in the future of operating under the rate objected to, so that the material fact of value is left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate, and thus eliminating, as far as is possible, the doubt arising from opinions as opposed to facts."

No one can read the evidence in a case of this character without being impressed with the fact that it lacks in many particulars that certainty which ought to be found when upon it a court is asked to base its decision that a law of the state is unconstitutional and void. In the matter of assigning the expenses between the freight and passenger departments, in the matter of assigning values between these departments, there is room for a large difference of opinion as to the methods to be adopted; and though in many instances, if not in most, the rulings of the master were against the company, yet even then, where the difference between the return which the evidence shows the railroad company did receive and a fair one, say 7 per cent., is so small, I do not think that it can be said that a rate of 2½ cents, if it were put in force, would be confiscatory.

The original bill should therefore be dismissed. No costs will be taxed for or against any party to either the bill or the supplemental bill.

Let a decree be entered accordingly.

The decree, so far as the supplemental bill is concerned, should contain a provision to the effect that the Railroad Commission and the Attorney General of the state may apply at any time to the court by bill or otherwise, as they may be advised, for a further order or decree, whenever it shall appear that, by reason of a change in circumstances, the rates fixed by the state's acts and orders are sufficient to yield to the company reasonable compensation for the services rendered.

## TABLE 4

### Chicago & Northwestern Railway Co. Lines in South Dakota.
### Results for the year ending June 30, 1908, as found by the Special Master.

#### At Three Cents per Mile.

| | Total State Traffic | So. Dak. % of Expense of System. | Total Freight Traffic. | Freight % of State Traffic. | Intrastate Interstate Miscellan's | % | Intrastate Miscellan's | % | Interstate Traffic / Interstate Miscellan's | Interstate % of Intra and Inter State Passenger Traffic. |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating revenue | $ 3,060,845.93 | | $ 1,605,781.59 | | $715,872.10 / 477,081.62 / 262,160.62 → 1,455,114.34 | | $715,872.10 / 149,798.58 → 865,670.68 | 57.14 | $477,081.62 / 149,798.58 → 589,443.66 | 42.86 |
| Rentals and joint facilities | 5,552.96 | | 1,001.92* | | 6,554.88 | | 3,745.46 | 57.14 | 2,809.42 | 42.86 |
| Outside income | 130,890.54 | 5.9949 | 84,581.47 | 64.62 | 46,309.07 | 35.38 | 26,461.00 | 57.14 | 19,848.07 | 42.86 |
| Total income | 3,197,289.43 | | 1,689,311.14 | | 1,507,978.29 | | 895,877.14 | | 612,101.15 | |
| Operating expenses | 2,496,428.53 | 5.9949 | 1,613,242.08 | 64.62 | 883,186.45 | 35.38 | 504,652.74 | 57.14 | 378,533.71 | 42.86 |
| Taxes | 174,602.51 | | 112,828.14 | 64.62 | 61,774.37 | 35.38 | 35,297.88 | 57.14 | 26,476.49 | 42.86 |
| Total expenses | 2,671,031.04 | | 1,726,070.22 | | 944,960.82 | | 539,950.62 | | 405,010.20 | |
| Net Income | 556,258.39 | | 36,759.08* | | 563,017.47 | | 355,926.52 | | 207,090.95 | |
| Valuation | 20,000,000.00 | | 12,924,000.00 | 64.62 | 7,076,000.00 | 35.38 | 4,043,228.40 | 57.14 | 3,032,773.60 | 42.86 |
| Percentage of net income to valuation | 2.63% | | 28%* | | 7.95% | | 8.80% | | 6.82% | |

#### At Two and One-Half Cents per Mile.

| | Total State Traffic | So. Dak. % of Expense of System. | Total Freight Traffic. | Freight % of State Traffic. | Intrastate Interstate Miscellan's | % | Intrastate Miscellan's | % | Interstate Traffic / Interstate Miscellan's | Interstate % of Intra and Inter State Passenger Traffic. |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating revenue | $ 2,906,852.69 | | $ 1,605,781.59 | | $623,096.02 / 415,864.46 / 262,160.62 → 1,301,121.10 | | $623,096.02 / 149,798.58 → 772,894.60 | 57.14 | $415,864.46 / 112,362.04 → 528,226.50 | 42.86 |
| Rentals and joint facilities | 5,552.96 | | 1,001.92* | | 6,554.88 | | 3,745.46 | 57.14 | 2,809.42 | 42.86 |
| Outside income | 130,890.54 | 5.9949 | 84,581.47 | 64.62 | 46,309.07 | 35.38 | 26,461.00 | 57.14 | 19,848.07 | 42.86 |
| Total income | 3,043,296.19 | | 1,689,311.14 | | 1,353,985.05 | | 803,101.06 | | 550,883.99 | |

| | | | Intrastate Miscellan's | Intrastate Interstate Miscellan's | Interstate Miscellan's |
|---|---|---|---|---|---|
| Operating expenses | 2,496,428.53   5.9949 | 1,613,242.08   64.62 | 883,186.45   35.38 | 504,652.74   57.14 | 378,533.71   42.86 |
| Taxes | 174,602.51 | 112,828.14   64.62 | 61,774.37   35.38 | 35,297.88   57.14 | 26,476.49   42.86 |
| Total expenses | 2,671,081.04 | 1,726,070.22 | 944,960.82 | 539,950.62 | 405,010.20 |
| Net income | 372,265.15 | 36,759.08*   64.62 | 409,024.23 | 268,150.44 | 145,873.79 |
| Valuation | 20,000,000.00 | 12,924,000.00   64.62 | 7,076,000.00   35.38 | 4,043,226.40   57.14 | 3,032,773.60   42.86 |
| Percentage of net income to valuation | 1.86% | 28%* | 5.78% | 6.50% | 4.81% |

| | | | Intrastate Miscellan's | Intrastate Interstate Miscellan's | Interstate Miscellan's |
|---|---|---|---|---|---|
| At Two Cents Per Mile | $ 2,729,478.49 | | $519,422.42   342,163.86   262,160.62 | $519,422.42   149,798.58 | $342,163.86   112,362.04 |
| Operating revenue | | $ 1,605,731.59 | 1,123,746.90 | 669,221.00 | 454,525.90 |
| Rentals and joint facilities | 5,552.96   5.9949 | 1,001.92* | 6,554.88 | 3,745.46   57.14 | 2,809.42   42.86 |
| Outside income | 130,890.54   -5.9949 | 84,581.47 | 48,309.07   35.38 | 26,461.00   57.14 | 19,848.07   42.86 |
| Total income | 2,865,921.99 | 1,689,311.14 | 1,176,610.85 | 699,427.46   57.14 | 477,183.39 |
| Operating expenses | 2,496,428.53   -5.9949 | 1,613,242.08   64.62 | 883,186.45   35.38 | 504,652.74   57.14 | 378,533.71   42.86 |
| Taxes | 174,602.51 | 112,828.14   64.62 | 61,774.37   35.38 | 35,297.88   57.14 | 26,476.49   42.86 |
| Total expenses | 2,671,081.04 | 1,726,070.22 | 944,960.82 | 539,950.62 | 405,010.20 |
| Net income | 194,890.95 | 36,759.08* | 231,650.03 | 159,476.84 | 72,178.19 |
| Valuation | 20,000,000.00 | 12,924,000.00   64.62 | 7,076,000.00   35.38 | 4,043,226.40 | 3,032,773.60   42.86 |
| Percentage of net income to valuation | .97% | 28%* | 3.27% | 3.94% | 2.38% |

Note: Figures to which a * is appended indicate a deficit.